The next case on the docket is 4-14-0131, People v. DeAndre Daniels. Appearing for the appellant is Attorney John McCarthy and for the appellee, Attorney Julia K. Wykoff. Mr. McCarthy, are you ready to proceed? Yes. You may. Your honors, counsel, may it please the court. My name is John McCarthy and I'm from the Office of the State of Health Defender. I represent DeAndre Daniels in this matter. This case involves a protracted gang war between two gangs, Money Over Bitches and Blackout Mafia. The gang war began with an argument over mic time and culminated in the shooting that ended the subject of this appeal. Because of the nature of the evidence in this case, trial counsel wanted the trial court to question the veneer about potential gang bias. This request is based on the Illinois Supreme Court decision in People v. Strength. In that case, it also involved a gang war and trial counsel wanted the trial court to question the jury about gang violence and refused to do so. The Supreme Court recognized that trial court has wide discretion in deciding on the question of veneer. However, the trial court must exercise this direction in a manner consistent with the purpose of the veneer. By failing to question potential jurors about gang violence in a gang-related case, defense counsel was denied an intelligent basis in which to exercise peremptory challenges or challenges for cause. Why is that? That is, you're looking at a panel that has a lot of experience with voir dire examination and there are three parts to it. The first part is when the judge asks questions of prospective jurors. And the second part is when, in a criminal case, the state is permitted to do it. And the third part is when the defense counsel is permitted. Isn't that how it works? In this case, I believe the judge did the voir dire and he forbid any inquirements of gang violence.  Was there voir dire questions asked by the prosecutor and the defense attorney in this case? I cannot say with 100% certainty. However, I can say that there was a motion eliminated prior to voir dire and the judge forbid anybody asking a gang-related question. That's not what the record chose, counsel. The record was asking the judge to ask questions about this and the judge said, I'm not going to do it. Why didn't the defense counsel then go ahead and ask the questions himself if he thought it was so important? Or at a minimum, if he thought, gee, I had asked for both permission and on the alternative for me to ask about it, ask for clarification since it's his motion, and the judge, his ruling simply said, I'm not going to do it. It said nothing about you may not, counsel. Actually, what the trial court did was a compromise ruling. He didn't say, I won't ask any questions about gang violence. He said that I would ask them, are members of the voir dire familiar with the groups MOB and BON? But your argument is that's insufficient, right? Correct. Your argument is the jury should have been asked about gangs and do they have a particular attitude about gangs that might be some evidence in this case so that if there's a problem, they could be excused. Is that right? That's your argument, isn't it? Correct. So if the trial court chose not to do it, why didn't the defense counsel do it if he thought it was so important? I don't know. Well, then why should we conclude that the trial court erred when the only issue before us is the trial court's decision that the court itself would not ask this question? The court itself made a ruling that this case didn't involve gangs because the state made a representation to the court that they were going to refer these groups as rival rap groups and it would be unnecessary at that point. But there's no prohibition on this record directed to defense counsel saying, and by the way, counsel, you may not inquire about that. There's nothing affirmative in the record. If that's what you're asking us to reverse this conviction based upon, that question never occurred. Isn't that right? The jury wasn't questioned about their attitude about gang violence and therefore that was error because the defense counsel raised it. But the counsel raised it in a motion asking for the court to ask the questions. And the court, for whatever reason, chose not to ask the questions, decided to do this other business about groups. But the record is totally silent about any prohibition on defense counsel. That's the point I want to emphasize. And why, given that silence, should we be of a mind to reverse the court for a ruling it was never called upon to make? I think part of the problem here is the manner in which the state misled both the defense counsel and the court on how it was going to present its case. It says it's going to present its case as these being two rival rap groups. And the problem with that is at the time they made that statement to the court, the state knew the problems it had with the witnesses. The state knew what its theory of the case would be. Its theory of the case was going to be, we're going to call these people rival rap groups, but we're going to paint a picture of them being gangs. And defense counsel could not anticipate that. Why couldn't he have anticipated that? That seems entirely clear, given the evidence that was presented and given the discovery that was furnished, that this would be rival groups, that in the eye of the beholder is it a group or is it a gang. And if the defense is concerned about that, he could have asked. But he didn't. I think defense counsel believed when he was discussing with the trial court whether or not they should enter into this gang discussion. I think he took the ruling to mean that it was off limits and the trial court was going to take care of it. Well, even if that's the case, number one, that's not what his motion asked for. And number two, if there's uncertainty or ambiguity, the burden is on the movant to seek clarification. Isn't that right? That is not the position the state has taken in this case. Well, I'm not asking about what the state has taken. I'm asking as a matter of procedure. It's the judge who you're seeking to reverse here. If the judge's ruling is ambiguous or uncertain, the judge thinks it's clear. It seems to me the movant should say, well, wait a minute, judge, what about me? Can I go ahead and ask those questions even though you've decided you're not going to? The judge thought it was clear. I believe my defense counsel believed it was clear that that was just off limits. I don't think there was any ambiguity. Well, it clearly isn't. I will tell you from having studied this record, the motion was directed to the court. The ruling was I'm not going to do it. There was a throw-in line in the motion, and by the way, defense counsel would like to do this, and that was it. That was the sole reference, and the judge never addressed it, and counsel never addressed it either. I think the fact that that is in the motion, that the court made the ruling it did, makes it a good issue. So we should reverse on that basis and not put the burden on defense counsel to seek clarification  Based on what the trial court said, it didn't seem ambiguous to me when I read it. Okay, go ahead. The state knew they were naive to believe that this wasn't going to involve getting evidence, and their closing argument said, we told you at the beginning of trial that witnesses were going to have a common theme. The common theme was going to be false amnesia, and I don't see anything. The state also told the jury that witnesses lied because they were either scared or they were going to take care of matters on their own in the street. That was the state's theory of the case, and I think it's obvious that anybody looking at that would know that they were talking about gangs, not rap groups. The second part of the court's ruling, first the settlement asked about BLM and MLB, and that's a deficient request. It does nothing to look into potential gang bias. And I think possibly that's what misled the trial attorney, is that he thought that that was all he was going to get at this point. Asking jurors about MLB and BLM doesn't make them aware that they're talking about money over bitches and the blackout mafia. And the reason that's important in this case is the gang my client belongs to, Money Over Bitches, a member of his gang had been charged with shooting an Illinois State student earlier that summer. And I think that gang is well known, and Illinois State is the lifeblood of McLean County. I believe that could possibly affect the potential juror. In your brief you talk about how there had been various news stories in this regard, but during voir dire when potential jurors were asked about their familiarity with MLB or BLM, really there was only one prospective juror that had any familiarity with either group. Is that right? Correct. So what relevance does the various news items have on this record where it would seem the panel, the entire veneer was unfamiliar with either group? Well you might be, if you're sitting up in the air and somebody asks you about some acronyms, like LK, and then you get into trial and you find out you're talking about the Latin Kings. I mean the acronym in and of itself may not ring that bell when you're sitting in the jury pool at that moment, but when you hear the entire name you know exactly who you're dealing with. I believe that's true in this case. The second part of the trial court's ruling involved asking potential jurors, I mean that he would limit the acts of violence between these two groups, were involved in to the argument over mic time and the incident that occurred, the fist fight that occurred prior to the shooting in this case on the same day. However, the trial court didn't do that. And at this point I'd like to incorporate arguments two and three because they involve incidents in addition to what happened over the fight over mic time and what happened that day. Issue two regarded the statement of Jake Williams. And that statement, it was a redacted statement from like a two and a half hour interview. And he said that Kenny King had been stabbed two weeks before the incident and therefore he wanted to accompany him to this fight to make sure it was a fair fight. The implication there is that Kenny King was going to go fight the guy who stabbed him. And that's an incident of violence between these two groups. At the end of the redacted interview, Jake Williams says something about, oh yeah, last summer a member of the Blackout Mafia pointed a gun at me. That's another incident of violence that takes these people out of the realm of rap groups and into the realm of gang members. And neither piece of information is admissible. It's not relevant. It's not other crimes evidence. There's no evidence my client knew anything about any of this stuff or was involved in either incident. However, it was highly prejudicial and inadmissible and also relates to the first issue. The third issue involved the fact that my client was visited by Kenny King, Sean Carner, and Antoine Smith over a month after this incident. And according to the prosecution, this evidence is admissible to show some kind of common purpose that they all shared, that they stayed together after the shooting. The only common purpose that they could have been involved in after a month and a half after the shooting is making sure witnesses have false amnesia, making sure they say they don't know what happened, and making sure we make plans on how to take care of things on the street, which is precisely the state's theory of the case. I think that's highly prejudicial to my client when we're acting as if there's no gang violence involved in this case. The second reason the state said they wanted to introduce that evidence was to show that they remained a close affiliation. Antoine Smith, one of the people the state complained about, is my client's brother. His brother's visiting him in jail, and somehow that's relevant to what's going on in this case. All this was was an attempt to find my client guilty by association, and that's a widely disputed theory. Because his brother visited him in jail? That was the state's theory for getting it in. Well, what's the prejudicial effect of his brother visiting him in jail? What's the relevance? See, that's not quite the question I just asked. I understand, Your Honor. I mean, it's a two-pronged question. Conceding minimal relevance, what's the prejudicial effect of his brother visiting him in jail? Well, along with the other two, it goes back to the statement I made earlier. The only reason you would introduce that evidence is to show that they were plotting something nefarious after the fact, like they were intimidating witnesses or something along those lines. And that's how the prosecution wanted to use it. That's your prejudicial effect. Even without this inadmissible evidence, the admissible evidence demonstrated that these groups are gangs. The manner in which the fight took place, there was a fistfight earlier in the afternoon. The money-over-bitches got together, get in two SUVs, parked about a block and a half to two blocks away from where the other gang is at, and they get up and they sneak up on them and they ambush them. That's the kind of thing you see in any kind of B-rate gang movie, the ambush after a fight. The other important part of it is, Tamika Alexander initially told police that she was more than willing to go down to the police station and make a statement. She then went over to talk to her son, KK, who had been involved in the fight and had received a broken jaw. She immediately returns to the police officer and says, I ain't going down to the police station. I don't want no more violence visited upon my family. The inference there isn't that she went over there and talked to KK, and KK told her, oh, no, don't go downtown. They're all in a rap group. The inference is that they were members of a gang and they would threaten their family. And then Michelle Brown, during her statement to police, she is going through all the evidence that she says she saw and naming these individuals by their street names. The police officer was immediately able to get up, based on the street names, get pictures of these individuals and have Michelle Brown identify them. This implies that they were on record, not as a rap group, but probably as members of a gang. Throughout this entire case, the state's theory was, the witnesses aren't all telling you the truth, they have false amnesia, they were afraid to testify, and they'd rather sell scores outside of court. The only evidence in this case that ties my client to the shooting in this case is the testimony, or the numerous statements of Michelle Brown, which in and of themselves are unreliable. By the time she got to the police station, she may have talked to up to 100 people. And we know that because while the tape is rolling, while she's in the police station by herself in the interrogation room, she takes no further than 12 to 15 calls. She's acting like a simple operator. And all of them are talking about what happened. So the question is, is Michelle Brown relaying what she saw or what she was told she saw? And her motivation to say what she was told she saw was, one of the victims in this case was her son. And she saw him being shot. And therefore, she wanted to take retribution on the people who were the shooters. By the time of trial, she admits that she wasn't outside with everybody. She came out later and somebody told her what had happened. That's how she came up with this story. Was all of this information presented to the jury? Oh, yes, it was. And they apparently believed her anyway? They could have, but I think they were unduly influenced by the gang evidence. In this case, it wasn't supposed to be included. And what's interesting to me in this case is Jake Williams, the other purported shooter, was tried first, and the state was unable to get a conviction for attempt murder. And if they had convicted him, you wouldn't be here arguing now? I would still have seen him. So that wouldn't have made any difference? No, I think it made a difference in the way that the state prosecuted this case. I think they slanted their evidence more towards the gang evidence. And he was convicted of aggravated battery with a firearm. And that's the prejudice here. Whether you believe Michelle Brown or not, the question then becomes is the gang evidence that influenced the jury to the point to convict him of attempt murder? The first question, whether or not that evidence that you've just been talking about is relevant to the issues before the trial court? And the second question, isn't that a matter left within the sound discretion of the trial court to make its determination? I don't know if I followed the question exactly. The evidence about the gang evidence, as you put it. Is it in a two-fold question? One, was it relevant? And two, when the trial court deemed it relevant, isn't that something we would review on the basis of whether the trial court, in so concluding, abused its discretion? I think the trial court made clear it didn't think any gang evidence came in. I don't understand. Well, the evidence that you call gang evidence is the evidence the trial court decided to let in because it was relevant. Isn't that correct? I don't believe any of it was relevant. The stabbing of Kitty King, and I think it is in the abuse of discretion. The trial court let it in because the court thought it relevant? It must have, but it was in the abuse of discretion. And so the standard is by letting it in, did the court abuse its discretion? Evidentiary ruling, yes. Okay. I see my time is up. Thank you. All right. Thank you, counsel. Ms. Wykoff. Thank you, Your Honor. May it please the court, counsel. Your Honors, oftentimes in professional sports, a phenomenon known as omerta arises. Known as what? It's called omerta, O-M-E-R-T-A. This happens oftentimes in cycling. I thought it was the mafia term for silence. No, it's the cycling mafia term for silence. Cycling? Yes, like professional cycling, Lance Armstrong. Okay. So this occurs where athletes refuse essentially to rat each other out for doping. It's known as omerta. That's what the state was up against in this case. The state below referred to it as false amnesia. I today refer to it as omerta. And that's why the evidence in this case was so important, because the probative value of the evidence became so high, because under omerta, none of these actors would cooperate with the state or with law enforcement. As Justice Steigman has noted in People v. Johnson, the jury has a right to know who the players are, why they're there, because otherwise, the case is otherwise inexplicable without that background evidence. There was, of course, a lot of discussion about whether the jurors believed that these were rap groups or gangs. Your Honors, defense counsel filed a motion in limine to limit gang-related activity. Of course, the defendant argued that that would be prejudicial in the eyes of the jury. The defendant himself actually testified at his bond reduction hearing that he was a rap producer, he was in a rap group, and defense counsel himself stated that witnesses had indicated that these are rap groups, that they're not gangs. Defense counsel wanted these to be considered two rap groups, not gangs, and in fact, the state had charged the defendant initially with being a, he was charged with possession of a firearm by a street gang member, and they dropped that charge consistent with this new theory that the court, defense counsel, and the state agreed that these were going to be referred to as rival rap groups, and the word gang was not mentioned ever in the ears of the jury. What defense counsel is now asking on appeal is for us to go back and allow the jurors to be questioned about any kind of gang bias they have, despite the fact that at the trial court level, defense counsel wanted no mention of gangs whatsoever. He just wanted these groups to be referred to as rival rap groups. Your Honors, just as a hypothetical, let's say that the trial court did question the jurors about gangs. Do you have any gang bias? Do you know of gangs in this area, et cetera? And then any reference to gangs was never made once more throughout the whole proceeding. That reference alone to gangs during voir dire could have then led the jury to believe that these rival rap groups, as they were called for the rest of the trial, were gangs. So it's a double-edged sword, and the court exercised its discretion in saying no. We decided these are rival rap groups, and we're not going to have any discussion of gangs in the ears of the jury. Your Honors, in terms of the prior acts of violence, as Justice Seidman authored in Johnson, the events of that day would be otherwise inexplicable without the events that had led up to this actual fighting incident. As counsel notes in his brief, as well as in his arguments today, there were numerous incidents of violence between these two groups for essentially that whole summer leading up to this crime. And the state wanted to introduce, and actually filed a motion to introduce evidence related to other incidences other than what happened on that day. The court, again, exercised its discretion and said, we're only going to allow evidence of the events that happened this day, the events leading up to the shooting incident. Your Honors, there's also discussion about the jail visit evidence. The court actually allowed the evidence of the jail visits not to paint the defendant as any kind of bad person or as any sort of propensity evidence, but again, under omerta, like cycling, to show that these people know each other. The state was faced with a situation where everyone denies knowing each other, they deny being in these rap groups, they deny having any involvement in this incident, and they don't know each other at all. Well, the jail visit evidence established that they do know each other. They were visiting one another. You don't visit someone that you don't know in jail. And furthermore, the defendant stipulated to the admission of the calls, or of the visits, now, during the trial. And Your Honors, this is actually sound trial strategy, because then the state wasn't calling witnesses over and over to testify about who came to visit and when. Rather, it was a stipulation that was read to the jury, it was in and out, it established that these people knew each other, and that was the end of it. Your Honors, although we didn't discuss it in counsel's opening statements, defense counsel raised an issue regarding severance of the felon in possession of a weapon charge. This court, in People v. Pool, explicitly notes that this may be a matter of trial strategy to keep a felon in possession of a weapon charge, along with any other charges that the defendant faces. There are strategic reasons for this. For example, severing the charges might give the state two bites at the apple, or counsel wants to try and get an acquittal on all the charges at once, rather than face them separately, which might allow the state to shore up any evidence problems they had before. Your Honors, the cases that defendant cites in his brief are cases where defendant asked for a severance, and the trial court denied that severance. That's not what happened here. Defense counsel never asked for a severance of these charges, and he was not ineffective for doing so. Your Honors, finally, defendant raises an issue regarding sufficiency of the evidence. As Justice Stegman noted earlier, Michelle Brown testified, or in her police report and interview, she stated that she saw the defendant shoot the victim, Mr. Jackson. Her testimony was corroborated by the forensics that were at the scene. There were shell casings found that were consistent with her testimony about what had happened at the scene of the crime. There was a bullet hole through a fence. I believe a bullet had hit a brick wall, and shell casings were found consistent with what she had advised Detective Fenelia. Additionally, Your Honors, and this might seem like a small point, but again, going back to Omerta and everyone's not cooperating, her testimony regarding nicknames was very important because it established that she did know who these people were. She even knew what their nicknames were, and who was who as demonstrated by the photographs. Your Honors, for these reasons, the State believes that all of the evidence that was admitted had significant probative value, not just to show propensity, but to show motive, to show the continuing narrative of events, and quite simply to show that all of these people knew each other despite their testimony at defendant's trial. Unless Your Honors have any questions, the State asks that you affirm. Thank you. All right, thank you. Mr. McCarthy, rebuttal. By the way, Mr. McCarthy, something I forgot to ask earlier and I was reminded about, and that is, with regard to the jail visits, wasn't that evidence stipulated too? Yes and no. There was a motion in Lemonnay ahead of time. Defense counsel did not want to introduce any evidence, and it was included in his post-trial motion. He didn't want to introduce any evidence. The fact that he stipulates the evidence, there's no way of concession that he wanted it then. Well, how do you stipulate to the admission of certain evidence and preserve the issue? How do you have a stipulated bench trial? You do it to preserve the issue. A stipulated bench trial preserves the ultimate finding of guilt, but you are not permitted to, and you can appeal, but when you stipulate to the admission of evidence, as occurred here, how do you preserve the issue to then challenge the evidence you stipulated to on appeal? Appellate courts have consistently said that when you raise an issue concerning stipulated evidence for the first time on appeal, he made his arguments to the trial court. The trial court said it was coming in, and he could have forced the state to come in, and all they would do is have a jailer come in, testify to, on such and such a date, so-and-so checked in on such and such a date. It was fairly monotonous, benign testimony, but it doesn't change the fact the defense counsel had objected to it and included it in his post-trial motion. He had thoroughly preserved the issue. Do you have any case law that supports the notion that you can stipulate the evidence and still maintain an objection as to that evidence on appellate review? I know the case law I cited, the appellate courts consistently held, that when the evidence stipulated to is challenged for the first time on appeal, you cannot do that. And so I believe the inverse would be true if you challenged it, and you're just making your trial a little more efficient on something as mundane as when does somebody come visit and when does somebody not, because that's not the value of the evidence. The value of the evidence was the visit took place. And I think this issue is thoroughly preserved. Well, it would be a situation, it seems to me, where if the matter has been ruled against earlier, at a minimum, say, well, judge, I don't want to drag out these proceedings, but I want to make sure the record shows my continuing objection to this evidence. So if Mr. Prosecutor wants to make these representations in front of the jury, let him go ahead as far as when his visitation has occurred or calls witnesses, but I want to show my continuing objection. When you stipulate to the admission of evidence, it's like stipulating to the testimony of the drug analysts that, yes, here's the weight of the drugs and they were cocaine. As a matter of fact, I think we have cases where the Supreme Court has said, having done that, we're not going to entertain your appeal where you're challenging the weight or the identification of the drugs. Isn't that essentially the same thing that's happened here? I'm not familiar with the case that you're talking about. Like I said, the cases I have read all talk about when you raise it for the first time on appeal. Why should we open up the door to a party stipulating to evidence a trial and then trying to challenge that evidence on appeal? If you want to challenge it at trial, which you did, just don't stipulate to it. How tricky is that? I think it's a matter of judicial economy. Well, how about this as a matter of economy? It says, Judge, we want to show a continuing objection to this. We're just not going to prolong it further. So we'll let the prosecutor make these representations. We object. I think once your motion eliminates the deny to bring it up again at trial is a fruitless effort. You still have to make a contemporaneous objection. Go ahead. I'm sorry. I didn't mean to take up all your time. The only point I'll make, given my limited amount of time, has to do with the sufficiency of the evidence. As far as the 25-year add-on, I believe it should be reduced to 20-year add-on because they never proved that he personally discharged the firearm. They never recovered the bullet. They don't know if it's the same caliber that was shot in that place. Ms. Brown, in her statement, says she didn't actually see him.  Go ahead. She didn't actually see Jackson go down from the shot, and she also was not aware of the third shooter. That was testified to by Brandy Brankowski. I think given all those situations when you have multiple shooters and you don't know which bullet hit, you cannot say beyond a reasonable doubt that my client personally discharged the weapon. Thank you. All right. Thank you, counsel. Thank you both. This case will be taken under advisement and a written decision shall issue.